PER CURIAM.
Pursuant to Florida Rule of Appellate Procedure 9.140(c)(1)(B), the State of Florida appeals from an order granting William Champers’ motion to suppress his statements and all physical evidence seized from his person after law enforcement detained him on another’s property. The trial court found that law enforcement’s temporary detention of Champers was illegal because it was based upon nothing more than a bare hunch that Champers was committing or about to commit a crime on the property. Applying the relevant law de novo to uncontested facts, we hold that the deputy had reasonable suspicion to detain Champers to investigate whether he was trespassing on the property, and reverse.

Uncontested Facts

Champers was charged by information with burglary of a dwelling. The information alleged that on November 7, 2012, Champers entered or remained in a dwelling on Hiawassee Road, in Orange County, Florida, without being licensed or invited to enter, and with the intent to commit an offense therein. Champers filed a motion to suppress all evidence against him — his statements, a pair of gloves, a screwdriver, and a knife — on grounds that he was detained without reasonable suspicion that a crime was being committed or was about to be committed.
*339 At the suppression hearing, veteran[1] Orange County Sheriffs Deputy Scott Sturrup testified that he was heading North on Hiawassee Road to assist other units with an unrelated call when he observed an adult male in a gray hooded sweatshirt near the front door of a residence on Hiawassee Road. This occurred mid-day, close to 1:00 p.m. The house sat just off the east side of the road in an all-residential area that had been experiencing a high number of daytime crimes, including burglaries and robberies. In response, the police had been conducting proactive patrols in that area to reduce the number of these crimes.
The man, later identified as Champers, was standing “[u]p towards the front door on the steps” with the hood on his sweatshirt down. Then Deputy Sturrup observed Champers step off the front steps and start walking north in the grass along the front of the house toward a gate in the side yard. The deputy observed that at that point “[i]t just didn’t seem like [Champers] belonged there,” so he “turned around to come back and see if he was there — still there or moving on.” When Deputy Sturrup circled back to the house, he observed Champers opening and entering the side gate while pulling the hood of his sweatshirt onto his head and looking down, as if attempting to conceal his face from potential onlookers. Champers continued walking toward the back ■ of the residence in this fashion. Deputy Sturrup called for additional units to respond and waited.
About four minutes later, Champers reemerged from the side gate and began wálking back in front of the house toward Deputy Sturrup. Deputy Sturrup told him to stop and asked Champers if he belonged at the residence. Champers responded that he was there to see Eugene Wilder, who was hard of hearing and could not' hear the doorbell. Champers’ body language seemed suspicious and Deputy Sturrup noticed a pair of gloves in Champers’ sweatshirt pocket. Upon investigation, Deputy Sturrup learned that the owner of the residence did not know Champers, the owner had not authorized Champers to enter the property, and no one named Eugene Wilder lived at the house. Deputy Sturrup then arrested Champers and located the other physical evidence in his search incident to the arrest.
Champers also testified at the suppression hearing, adding that it was a cold day (which would provide an innocent explanation for donning the hood of his sweatshirt). Champers believed that Eugene Wilder lived at the residence and went to the property to inquire about doing odd jobs for Wilder. Because he had been told that Wilder was hard of hearing and was normally on the backside of the house, he entered the property to attempt to rouse Wilder when no one answered his knock at the front door.

Applicable Law

“An investigatory detention occurs when an officer makes ‘an official show of authority from which a reasonable person would conclude that he or she is not free to end the encounter and depart.’ ” Majors v. State, 70 So.3d 655, 659 (Fla. 1st DCA 2011) (quoting Dees v. State, 564 So.2d 1166, 1167 (Fla. 1st DCA 1990)). Both parties agree that Deputy Sturrup detained Champers whén he stopped Champers to investigate his presence at the residence. To justify an investigatory *340 stop, police must possess specific, articula-ble facts that would warrant an officer of reasonable caution to believe that a person has committed, is committing, or is about to commit a crime. Popple v. State, 626 So.2d 185, 186 (Fla.1993). It is not sufficient that an officer have an “inchoate and unparticularized suspicion or ‘hunch’ ” that the defendant had committed, was committing, or was about to commit a crime. Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
Much has been written in this court about the' difference between reasonable suspicion and a bare hunch. Recently, for example, in Price v. State, 120 So.3d 198, 200 (Fla. 5th DCA 2013), we explained that the reasonable suspicion standard requires courts to examine the totality of circumstances, or “whole picture,” to determine whether the detaining officers had a “particularized and objective basis” for suspecting the person stopped of criminal activity. The particularity requirement means that the officer’s suspicion must be grounded in specific, articulable facts, while the objectivity requirement means that courts must “view the facts and circumstances through the lens of a reasonable police officer giving due consideration to his or her training and experience.” Id. In Wallace v. State, 8 So.3d 492 (Fla. 5th DCA 2009), this court noted that in addition to specific and articulable facts, courts may also consider “rational inferences from those facts.” Id. at 494 (quoting Terry, 392 U.S. at 21, 88 S.Ct. 1868). Factors commonly considered among the totality of circumstances in determining reasonable suspicion are “the time and day, the location, the physical appearance of the suspect, the suspect’s behavior, the appearance and manner of ... [movement], and anything incongruous or unusual in the situation as interpreted in the light of the officer’s knowledge.” Price, 120 So.3d at 202 (quoting State v. K.N., 66 So.3d 380 (Fla. 5th DCA 2011)).
In contrast, “inchoate (meaning in this context partial, unfinished, or imperfectly formed) and unparticularized suspicions or hunches will not suffice.” Price, 120 So.3d at 200 (citations omitted). “A ‘mere hunch’ is simply a suspicion based on bare intuition.” Wallace, 8 So.3d at 494.
In a case such as this where the relevant facts are undisputed, appellate courts determine de novo whether reasonable suspicion existed based on the facts found. K.N., 66 So.3d at 384. Additionally» “[w]hether the inference drawn by police was objectively reasonable involves the application of logic and judicial experience and is reviewable de novo.” Wallace, 8 So.3d at 494.[2] “[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.” Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); see also Chappell v. State, 838 So.2d 645, 647 (Fla. 5th DCA 2003) (“A court’s evaluation of reasonable suspicion is guided by common sense and ordinary human experience.”) (citation omitted).
In this case, the issue is whether Deputy Sturrup had a reasonable suspicion that *341 Champers was trespassing. Section 810.09(l)(a), Florida Statutes (2012), defines a criminal trespasser on property-other than a structure or conveyance as a
person who, without being authorized, licensed, or invited, willfully enters upon or remains in any property other than a structure or conveyance:
1. As to which notice against entering or remaining is given, either by actual communication to the offender or by posting, fencing, or cultivation as described in s. 810.011; or
2. If the property is the unenclosed curtilage of a dwelling and the offender enters or remains with the intent to commit an offense thereon, other than the offense of trespass.
Although the State does not specify which subsection it is relying upon, the undisputed facts found by the trial court establish that Champers willfully entered and remained on the property, and at one point opened the “side gate” and proceeded toward the rear of the home. The gate was part of a fence separating the “wide open” front yard from the back yard. These facts establish willfully entering or remaining on land other than a structure or conveyance, and the element in subsection 1., which is that notice against entering or remaining was given, either by actual communication, or by fencing. See Joyce v. Crowder, 509 Fed.Appx 969, 970 (11th Cir.2013) (“Of the four elements required to prove trespass, only the notice element is seriously at issue. We hold that the arresting officers had actual probable cause in that they were told ... that the protesters were on the west side of the fence on private property. The arresting officers reasonably assumed that the protesters had to have crossed the fence, thus constituting probable cause that the protesters had the notice required by Florida law for violation of its trespassing statute.”) (footnote omitted); cf. § 810.09(2)(b), Fla. Stat. (2012) (elevating trespass from second-degree misdemeanor to first-degree misdemeanor if offender “willfully opens any door, fence, or gate”). Thus, the only disputed element is whether Deputy Sturr-up had reasonable suspicion that Champers’ entry was not “authorized, licensed, or invited.”

Application of the Law to the Facts

Objectively viewing the totality of the circumstances from the perspective of this experienced deputy, we readily conclude that the deputy had reasonable suspicion to investigate Champers for trespassing. While it is certainly possible that a homeowner could be observed standing at the front door of his home one minute and walking through a side gate while putting his hood on for warmth the next minute, the stronger inference, more consistent with common sense and human behavior, as viewed through the lens of Deputy Sturrup’s experience and knowledge of recent daytime burglaries in the area, is that an unauthorized person, having determined no one was coming to the front door, was attempting to conceal himself while entering the enclosed curtilage of the property. If the totality of circumstances is ambiguous, involving conduct that can be interpreted as lawful or as criminal activity, police may detain an individual to resolve the ambiguity. Rhoden v. State, 941 So.2d 5, 9 (Fla. 2d DCA 2006) (citing Wardlow, 528 U.S. at 125, 120 S.Ct. 673).
We emphasize that “the relevant inquiry is not whether particular conduct is ‘innocent’ or ‘guilty,’ but the degree of suspicion that attaches to particular types of noncriminal acts.” United States v. Sokolow, 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting Illinois v. Gates, 462 U.S. 213, 243-44, n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Because Champers’ observed conduct was objectively suspi *342 cious, Deputy Sturrup did not violate Champers’ Fourth Amendment rights by briefly detaining him to investigate his presence on the property. Accordingly, we reverse the suppression order and remand for further proceedings.
REVERSED AND REMANDED.
TORPY, C.J., SAWAYA and LAWSON, JJ., concur.

. At the time of the incident, Deputy Sturrup had been a police officer for twenty-three years.

. By contrast, "[i]t is the function of the trial court to determine the historical facts, which includes a determination of whether a particular police officer has the experience to draw a particular inference from a given circumstance and whether the officer actually drew the inference.” Wallace, 8 So.3d at 494. The appellate court must defer to the trial court's fact-findings, id., by accepting those findings as long as they are supported by competent, substantial evidence, and by interpreting the evidence in the light most favorable to sustaining the trial court's ruling. State v. Quinn, 41 So.3d 1011, 1013 (Fla. 5th DCA 2010).